UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA PENNICK,<br><br>        Plaintiff<br>v.<br><br>MICHELE GRENNON, GRENNON DESIGN<br><br>        Defendants | Civil Action No: 05-CV-11060-WGY |

**MICHELE GRENNON AND GRENNON DESIGN'S REPLY TO PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION TO DISMISS AND/OR TRANSFER**

In response to Plaintiff's Objection to Michele Grennon and Grennon Design's motion to Dismiss And/or Transfer, Defendants Michele Grennon and Grennon Design submit the following reply.

**1.** **Because The Complaints Were Filed Simultaneously, The First-Filed Rule Is Inapplicable**

Plaintiff concedes that she and Grennon filed suit simultaneously. Elberg Affidavit ¶ 13. Yet she argues that because she beat Grennon to the courthouse by a few hours, she is the "true" plaintiff and her complaint should be given preference. Courts faced with simultaneous filings have held that "neither the 'first to file' nor the 'natural plaintiff' rules … have particular weight under these circumstances." Connexus Credit Union v. Connex Credit Union, 219 F.R.D. 465, 467 (W.D. Wis. 2003) (suits file approximately three hours apart); Ontel Products, Inc. v. Project Strategic Corp., 899 F. Supp. 1144, 1153 (S.D.N.Y. 1995) (finding the first-filed rule inapplicable when lawsuits were filed on the same day). Instead, courts facing simultaneous

filings try to balance the convenience of the parties and witnesses and the interests of justice. See Connexus Credit Union, 219 F.R.D. at 467.

Despite Plaintiff's assertions to the contrary, "the bare fact" that she filed an hour or two before Michele Grennon does not preclude transfer to New Hampshire. "Problems of multiple litigation in the federal judicial system are not to be solved by rote. Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems." Small v. Wageman, 291 F.2d 734, 736 (1st Cir. 1961). Accordingly, transfer should be decided on the traditional balancing of convenience and the interest of justice.

**2.      This Is Not A Case Of Anticipatory Filing, But Rather A Case Of Simultaneous Filing**

Plaintiff devotes a great deal of energy arguing that Grennon's Complaint is somehow improper because it is an "anticipatory" second filing. In so doing, Plaintiff misconstrues the fact and misapplies the law.

First, the doctrine of anticipatory filing is used by courts as an exception to the first-filed rule to favor a second-filed complaint. See Kleinerman v. Luxtron Corp., 107 F. Supp. 2d 122, 124 (D. Mass. 2000) (stating that a court may allow a later-filed case to proceed if the first-filed action was the result of a race to the courthouse). In this case, the complaints were filed simultaneously so the exception is not needed. Further, even if the few hours' difference in filing were significant, Plaintiff fails to explain why an exception to the first-filed complaint should be applied to favor the purported first-filer.

Second, Plaintiff mischaracterizes the facts when she claims that she was somehow "delayed" into filing first. Her claim that she delayed filing her action in good faith is disingenuous. As outlined in the Affidavit of Mark A. Wright, attached as Exhibit A, Grennon

2

made it clear from the beginning that she considered Plaintiff's claims baseless, and repeatedly asked for supporting evidence. Wright Affidavit ¶¶ 3, 5. Instead of providing evidence, Plaintiff responded by renewing her threats to sue and further threatened to file an ethics complaint with the American Society of Interior Designers. Wright Affidavit at ¶ 6. In doing so, she was apparently hoping to extract a quick concession from Grennon, the details of which she had never offered. Id. Indeed, it was not until Grennon pressed her for some idea of what she wanted that the Plaintiff even mentioned a range of possible solutions—solutions so vague and broad that her comments could not have possibly been construed, or could have been used, as a settlement offer at all. Wright Affidavit ¶¶ 6, 9.

     Plaintiff's delay in filing suit (if there was any) is not due to settlement discussions with Grennon or her pleas that Plaintiff not file. Wright Affidavit ¶¶ 6, 8. To the contrary, Grennon made it clear she would not capitulate to Plaintiff's repeated threats. For example, in response to plaintiff's demands that Grennon "provide assurances that [she] has ceased her unlawful conduct" and that she "not attend the Luxury Living Awards," Grennon told the Plaintiff that her claims were "untenable" and that she would attend the Awards. Wright Affidavit ¶¶ 4-5. Further, Grennon told the Plaintiff that Grennon had claims of her own. Wright Affidavit ¶ 7. While Plaintiff may have had a myriad of reasons for not filing suit immediately (such as legal expense, court costs, or uncertainty of the strength of her claims), those reasons were not due to the fact that she and Grennon were engaged in "good faith" settlement negotiations, because there were never any negotiations at all. Plaintiff's tactics of using threats to try to extract a quick settlement from Grennon should not be condoned by giving any credence to her claims of bad faith filing on the part of Grennon.

3

Finally, the Plaintiff implies that Grennon's Complaint is somehow inferior because it seeks a declaratory judgment. Once again, the Plaintiff misunderstands the law and the facts. Grennon's Complaint seeks <u>both</u> damages and declaratory judgment. There is nothing improper or inferior about obtaining relief from unsubstantiated claims, protecting intellectual property rights, and seeking other relief beyond the scope of what a party is expected to bring in a threatened suit. <u>Ontel Products, Inc.</u>, 899 F. Supp. 1151. Here, the Plaintiff seeks a variety of common law claims in state court. Grennon's copyright claims—which are central to the ownership of the overall design of the project—could not have been raised in state court at all.[1] Not only was Ms. Grennon's federal complaint proper as a means to raise her claims and protect herself from Plaintiff's ongoing harassment, it was the only way she could raise some of those claims at all.

**3.    The Dispute And Key Witnesses Are Centered Around The Project In New Hampshire**

   a.    <u>Pennick's shopping activities in Massachusetts are not material to the resolution of the central issue in this case—who created the design located in New Hampshire.</u>

Both Plaintiff's and Grennon's claims turn on the design and renovation of Grennon's New Castle home (the "Project") —a design that was created, implemented, and is still located in New Hampshire.

Plaintiff concedes, as she must, that the design of the Project is centered in New Hampshire. She readily admits that she "traveled frequently to New Hampshire to create and implement her design" (<u>see</u> Plaintiff's Opposition page 10). She further alleges in her Complaint that she:

---

[1] Pennick's claim under Massachusetts common law copyright have been pre-empted by the Copyright Act for nearly thirty years. 17 U.S.C. § 301; <u>G. Danielson, Inc. v. Winchester-Conant Props., Inc.</u>, 186 F. Supp. 2d 1, 27 (D. Mass. 2002).

4

- Was hired to perform interior design service on Grennon's home in New Castle, New Hampshire. Complaint ¶ 9.

- Worked closely with the builder and the architect on the job site. Complaint ¶ 12.

- Worked on the home in New Hampshire while Grennon was on vacation and on other trips. Complaint ¶ 12.

- Brought the items she purchased to Grennon's home in New Hampshire; Complaint ¶ 14.

- Hoped to use the New Hampshire Project to generate additional business. Complaint ¶ 16.

In Plaintiff's Complaint, it is the New Hampshire Project that is the center of the dispute and it is New Hampshire where the Project was created, where it is located, and where she goes to show the design to her own clients[2], or to film a television show about it. Complaint ¶¶ 17-19.

Now that Pennick is faced with the motion to transfer, she suddenly asserts that although she "traveled frequently to New Hampshire to create and implement her design, the current dispute centers on Pennick's work in Massachusetts." Plaintiff's Opposition page10. Plaintiff cannot have it both ways, arguing for purposes of her Complaint that she designed and implemented the Project in New Hampshire, but when faced with a motion to transfer, arguing instead that her "design" activity happened in Massachusetts. As outlined in the Affidavit of Michele Grennon, the stores in Massachusetts where Plaintiff alleges she did all her design work sell furniture, rugs, fabric and other related items. Grennon Affidavit ¶ 3, Attached as Exhibit B. Surely the Plaintiff cannot be claiming that this dispute concerns what was bought at the Boston Design Center or that she has design rights to the rugs, furniture, or fabrics purchased there. The dispute, as alleged in her Complaint (and in Grennon's Complaint as well) concerns what was created—and is still located—in New Hampshire.

---

[2] According to Pennick, she took three clients to New Hampshire to see it. Pennick Affidavit ¶ 6)

  b. <u>All of Plaintiff's claims arise out of the oral contract entered into in New Hampshire and the creation, ownership and use of the design located in New Hampshire.</u>

There is no question that the locus of this dispute is New Hampshire. Virtually all of Plaintiff's claims are based upon the oral contract between herself and Grennon, and her role in the creation of the design located in New Hampshire:

- Count I: MGL 93A—based on the oral contract entered into in New Hampshire and representations about ownership of the Project's design located in New Hampshire (not about ownership of the items purchased at the Boston Design Center)

- Count II: Breach of Contract—based on Plaintiff wanting to film a television show at the Project in New Hampshire (not in Massachusetts or at the Boston Design Center)

- Count III: Breach of Covenant of Good Faith and Fair Dealing—based on alleged statements made in New Hampshire at the time of the oral contract regarding the Project in New Hampshire

- Count IV: Deceit—based on alleged representations made in New Hampshire regarding the use of the Project in New Hampshire (not the use of the Boston Design Center)

- Count V: Unjust Enrichment—based on the ability to used the Project in New Hampshire to promote her business (not on using the Boston Design Center to promote business)

- Count VI: Massachusetts Common Law Copyright—no longer a viable cause of action, but ostensibly based on the ownership of the Project's design located in New Hampshire.

- VII: Declaratory Judgment Action—based on ownership of the design located in New Hampshire (not the use of, or access rights to, the Boston Design Center)

Again, Plaintiff wants it both ways—for purposes of her Complaint, the central issue is ownership of the New Hampshire design. But for purposes of venue, Plaintiff claims that the central issue are activities in Massachusetts, pointing to her shopping activities, an award

6

ceremony, a magazine article (published throughout New England), and a postcard sent to a rug distributor.

Plaintiff also makes much of the fact that she has Chapter 93A and defamation claims involving Massachusetts law. This, however, is pure bootstrapping. Plaintiff can only bring those claims by showing in the first instance that she is the owner of the New Hampshire design or had specific rights under the New Hampshire oral contract. Absent showing that she has rights in the Project's design, she has no good faith basis to bring either claim—or for that matter, any other claims based on her allegations that the New Hampshire Project is "her" design.

  c. <u>The key witnesses are those people involved in the project, not salesmen, reporters, publishers, or the plaintiffs other clients</u>

In trying to bulk up the connection to Massachusetts, Plaintiff lists as "key" witnesses anyone in Massachusetts to whom she can find a conceivable connection.[3] Once again, the Plaintiff is trying to have it both ways. In her Complaint, she alleges that she was the sole interior designer and worked closely with the builder, Ben Auger (located in Portsmouth, New Hampshire) and the architect, Brendan McNamara (located in Eliot, Maine) on the job site in New Hampshire. Complaint ¶ 12. Further, she asserts that after she completed design plans and discussed them with Ms. Grennon, she <u>then</u> went to purchase the items for Ms. Grennon's home. Complaint ¶ 14.

Faced with the motion to transfer, Pennick does an about-face. Gone are the claims that she worked closely with the architect and builder in New Hampshire. Gone are her claims that she traveled frequently to New Hampshire and that she purchased items for Grennon's home only after she and Grennon and she settled on a design plan. Instead, Plaintiff now claims that all her

---

[3] To bolster her claims further, she even goes so far as mentioning that there are additional witnesses, but that she only knows them by first name.

7

design work was done on the floor of the Boston Design Center, stores—stores that sell furniture, rugs and fabric.  See Grennon Affidavit ¶ 3.  As a result, the salespeople in those stores are suddenly the "key" witnesses to the design of the New Hampshire Project.

Despite asserting these sales people "key" witnesses, nowhere does she alleged (nor can she) that any of them took part in the conception, the implementation and the completion of the overall design of the Project or that they have any personal knowledge as to the oral contract between Grennon and the Plaintiff.[4]  The most any of these purported "key" witnesses can speak to is to what items were purchased from their stores—evidence that is best presented through invoices and by viewing the actual items purchased.

Similarly, the testimony of John Kenny and Christina Tassi as to who applied for and attended the Luxury Living Awards adds nothing of substance as to who created and owns the Project's design.  Nicole Goldman, as the author of an article written nearly three years after the Project was completed, see Pennick Complaint ¶ 21, had nothing to do with the creation of the Project's design or the contract between Plaintiff and Grennon.  Similarly, Gayle Reynolds cannot speak to Plaintiff's role in the Project because Reynolds was no longer involved in the project by the time Plaintiff began working for Grennon.  Declaration of Michele Grennon in Support Michele Grennon and Grennon Design's Motion to Dismiss Or Transfer Venue ¶ 6.  Finally, Plaintiff's clients, the ones she allegedly took to New Hampshire to see the Project after it was complete, cannot possibly have personal knowledge of either the Plaintiff's role in the design or the nature of the contract between the Plaintiff and Grennon.

---

[4] If salespeople were "key" witnesses, the key witnesses would certainly have to include each and every person who sold items that are part of the Project, including salespeople in New Hampshire, Maine, and other states.  Grennon Affidavit ¶ 4.  According to Plaintiff's theory, the salesmen for lumber, paint, wiring, appliances lighting, hardwoods, hardware, flooring, bath fixtures, electronics, art, and hundreds of other products would all be "key" witnesses, each testifying as to whether it was Ms. Grennon, Ms. Pennick, or someone else who purchase that particular item.  The absurdity of such an argument is readily apparent.

8

When evaluating the convenience of witnesses, it is not the number of witnesses, but rather the substance of their testimony that is important. As explained by the Rhode Island District Court, "in assessing the import of the location of witnesses in the context of a motion to transfer, a court should not simply compare the numbers of witnesses residing in each district, but must also consider the content of their testimony. Depending on that content, one key witness may outweigh a great number of less important witnesses." Emissive Energy Corp. v. Armament Sys. & Procedures, Inc., 2004 U.S. Dist. LEXIS 18437 (D.R.I. 2004) (citations omitted). As demonstrated above, none of Plaintiff's Massachusetts witnesses are "key" witnesses. Other than the parties, the only two witnesses to the creation, implementation and completion of the design—and the only two people that were involved in the Project themselves—are the builder, Ben Auger, and the Architect, Brendan McNamara. Both are located in or around Portsmouth, New Hampshire. It is not a battle of numbers, but a weighing of substance. Here, substance clearly favors transfer.

                Respectfully submitted,
                MICHELE GRENNON AND
                GRENNON DESIGN
                By their attorneys,

                McLANE, GRAF, RAULERSON &
                MIDDLETON, PROFESSIONAL
                ASSOCIATION

Dated: June 27, 2005

                By:  /s/ Eric M. Sommers_____
                   Eric M. Sommers, BBO #649611
                   Thomas J. Donovan, admitted pro hac vice
                   900 Elm Street
                   P.O. Box 326
                   Manchester, NH 03105
                   Tel: 603-628-1337
                   Fax: 603-625-5650
                   eric.sommers@mclane.com

## Certificate of Service

Thomas E. Dwyer, Esq.
Jacob T. Elberg, Esq.
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210

      I hereby certify that on June 27, 2005, I caused to be served on the above-named counsel of record a copy of the forgoing Reply to Plaintiff's Objection to Defendants' Motion to Dismiss and/or Transfer via electronic transmission in accordance with the Court's Administrative Procedures for Electronic Case Filing.

                                                     /s/ Eric M. Sommers_____
                                                   Eric M. Sommers

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA PENNICK,<br><br>            Plaintiff<br>v.<br><br>MICHELE GRENNON, GRENNON DESIGN<br><br>            Defendants | Civil Action No: 05-CV-11060-WGY |

## AFFIDAVIT OF MARK A. WRIGHT, ESQ.

I, Mark A. Wright, being duly sworn, do hereby affirm that the following facts are true to the best of my personal knowledge:

I am an attorney in good standing authorized to practice law in the Commonwealth of Massachusetts and in New Hampshire. I am employed as an attorney at the firm of McLane, Graf, Middleton & Raulerson, 900 Elm Street, Manchester, New Hampshire, 03105 and was retained by Michele Grennon in this matter.

1. I have reviewed the Affidavit of Jacob T. Elberg, which he submitted in support of Lisa Pennick's Opposition To Defendants' Motion To Dismiss And /Or Transfer.

2. The letters attached to Attorney Elberg's affidavit speak for themselves.

3. At stated in Paragraph 4 of the Elberg Affidavit, I wrote Attorney Elberg on March 21, 2005 telling him that we did not believe his client had any protectable interest in the work done at Ms. Grennon's home. I asked Attorney Elberg for any evidence to support his client's contentions that she performed the interior design work. Attorney Elberg never offered any such evidence. A true copy of my letter is attached to Attorney Elberg's Affidavit as Exhibit B.

4. While I was away, Attorney Elberg sent a letter to Attorney Rand of this office. Mr. Elberg stated that Ms. Pennick would not be willing to discuss pre-suit resolution "unless we receive some assurances that Ms. Grennon has ceased her unlawful conduct." The letter further demanded that Ms. Grennon not attend the Luxury Living Awards that evening. A true copy of that letter is attached to the Elberg Affidavit as Exhibit C.

5. Attorney Rand wrote back telling Attorney Elberg that his "repeated assertions that Ms. Grennon's activities are unlawful are not well taken." Attorney Rand's letter reiterated my earlier request for "any evidence whatsoever" to support Pennick's claims. The letter also said that Ms. Grennon would be attending the Luxury Living Awards that evening. A true copy Attorney Rand's letter is attached to the Elberg Affidavit as Exhibit D.

6. Mr. Elberg's recounting and characterization of the April 12th conversations between us are erroneous and misleading. In Paragraph 8 of his Affidavit, Attorney Elberg states that during our telephone conversation that day, I said that I wanted to discuss the possibility of settlement. In actuality, I told Attorney Elberg that before deciding how to proceed, we needed some idea of what he was looking for, particularly since we had repeatedly told Attorney Elberg that we believed his client's claims were meritless. Up to that point, the only thing Attorney Elberg had done was threaten to sue and file ethics complaints unless my client settle. He had never given me any idea of what his client wanted, whether it was money, a letter acknowledging Lisa Pennick's contribution, or something else. I had to draw out from Attorney Elberg that possible solutions might include money in the range of $100,000 to $10,000, letters of apology, acknowledgment that Pennick was the lead designer at Ms. Grennon's home, or other possible remedies. Given Attorney Elberg's refusal to make a specific demand and his reticence and vagueness when pressed for what his client was looking for, I never considered this broad range

of possible remedies to be a settlement demand, nor could I be reasonably expected to believe it was.

7. Attorney Elberg's statement in Paragraph 9 is not true. During the April 12th telephone conversation with him, we specifically mentioned that Michele Grennon may assert claims against Lisa Pennick both with regard to Pennick's representations that she owned the design of the Project and with regard to Pennick's statements to others that Grennon "stole" Pennick's design. Attorney Elberg said he would address those issues with his client.

8. Attorney Elberg's assertions in Paragraph 10, that I repeatedly asked him not to file suit so we could pursue settlement discussions, is also incorrect and mischaracterizes that conversation. I did say, as any prudent attorney would, that we should try to avoid litigation if possible. I asked him to give me a chance to ask my client whether she had any interest in settlement. Attorney Elberg <u>told me</u> that he would not file a complaint if I got back to him later that day.

9. On April 14th, 2005, I received a telephone message from Attorney Elberg inquiring about settlement. At that point, Attorney Elberg had still not made specific settlement demand, nor had he provided us with any evidence to support his claims. I responded to his call with the letter attached as Exhibit F to Attorney Elberg's Affidavit. In that letter, I made it clear that we were considering all of our options. I did not ask him <u>not</u> to file suit.

FURTHER AFFIANT SAYETH NAUGHT.

Dated: June 24, 2005                               */s/Mark A. Wright*
                                                   Mark A. Wright

STATE OF NEW HAMPSHIRE
HILLSBOROUGH COUNTY

3

Subscribed and sworn to before me this 24th day of June, 2005

                                           */s/Jenny L. Smith*_____
                                           Notary Public [seal]
                                           My Commission Expires March 19, 2008

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

LISA PENNICK,

       Plaintiff

v.

MICHELE GRENNON, GRENNON DESIGN

       Defendants

Civil Action No: 05-CV-11060-WGY

## AFFIDAVIT OF MICHELE GRENNON

I, Michele Grennon, being duly sworn, do hereby affirm that the following facts are true to the best of my personal knowledge

1. I have reviewed Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and or Transfer and Lisa Pennick's supporting Affidavit, and am familiar with their contents.

2. As Lisa Pennick stated in Paragraph 5 of her Affidavit, Lucy Arnow Leak, Gretchen Schwilk, David Webster, Michael Gillick, Patricia Mullaney, Karine Jouenne, and Bernie Pine are sales people at various showrooms and stores that sell furniture, rugs, tile, fabric and home accessories.

3. For example, Lucy Arnow Leak works for Baker Knapp & Tubbs, a company that sells furniture;  Gretchen Schwilk works for Steven King, Inc., a rug distributor;  David Webster owns and operated Webster & Company, a distributor of wall coverings, furniture, and fabric;  Patricia Mullaney of Bygone's of Ireland, sells furniture and other imported items; Karine

Jouenne works at Soft Walls Associates, dealing in wall coverings; and Bernie Pine works for Landry & Acari, a rug dealer.

    4. In addition to the above mentioned people and companies, furniture, fabrics, floor coverings, lighting, paint, fine lumber, appliances, fixtures, art work, and many other items and materials used in the project were purchased from a wide variety of other sources, including stores and showrooms in New Hampshire and Maine, and other states.

FURTHER AFFIANT SAYETH NAUGHT.

Dated: June 27, 2005              /s/Michele Grennon_____
                                                 Michele Grennon

STATE OF NEW HAMPSHIRE
HILLSBOROUGH COUNTY

    Subscribed and sworn to before me this 27th day of June, 2005

                                                 /s/Sue Ireland_____
                                                 Notary Public [seal]
                                                 My Commission Expires February 5, 2008